ROBBINS GELLER RUDMAN & DOWD LLP
SHAWN A. WILLIAMS (213113)
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
    – and –
TRAVIS E. DOWNS III (148274)
BENNY C. GOODMAN III (211302)
ERIK W. LUEDEKE (249211)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
travisd@rgrdlaw.com
bennyg@rgrdlaw.com
eluedeke@rgrdlaw.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IRON WORKERS LOCAL NO. 25 PENSION FUND, Derivatively on behalf of PAYPAL HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JOHN J. DONAHOE, GAIL J. McGOVERN, DAVID M. MOFFETT, FRANK D. YEARY, JONATHAN CHRISTODORO, DAVID W. DORMAN, WENCES CASARES, PIERRE M. OMIDYAR, DANIEL H. SCHULMAN, JOHN D. RAINEY and PATRICK L.A. DUPUIS, <br><br> Defendants, <br><br> – and – <br><br> PAYPAL HOLDINGS, INC., a Delaware corporation, <br><br> Nominal Party. | Case No. <br><br> VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATION OF THE FEDERAL SECURITIES LAWS <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> DEMAND FOR TRIAL BY JURY |

**OVERVIEW OF THE ACTION**

1. This is a shareholder derivative action on behalf of nominal party PayPal Holdings, Inc. ("PayPal" or the "Company"). PayPal is a provider of technology platforms that allow consumers and merchants to make digital and mobile payment.

2. In 2013, PayPal, while a subsidiary of eBay, assumed control of Venmo, a smartphone application the enables users to pay others via text message. Two years later, PayPal became a separate publicly traded company as a part of a spin-off transaction from eBay. As part of the spin-off, eBay's shareholders received one share of PayPal stock for each share of eBay stock that they owned.

3. Defendants are certain of PayPal's directors – defendants John J. Donahoe, Gail J. McGovern, David M. Moffett, Frank D. Yeary, Jonathan Christodoro, David W. Dorman, Wences Casares and Pierre M. Omidyar; PayPal's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") – defendants Daniel H. Schulman and John D. Rainey, respectively; and PayPal's former CFO – defendant Patrick L.A. Dupuis (together, "defendants").

4. As PayPal's corporate fiduciaries, defendants owed PayPal fiduciary duties of loyalty and care – the highest duties known to the law. Nonetheless, while under the stewardship of defendants, PayPal's Venmo service engaged in unfair and deceptive business practices, exposing the Company to substantial costs, expenses and risk of loss. In particular, Venmo unfairly and deceptively used its users' phone contacts without disclosing how those contacts would be used, did not clearly disclose how Venmo users' transactions and interactions with other users would be shared, and misrepresented that communications from Venmo were actually from particular Venmo users. Additionally, PayPal's financial results were artificially inflated because they did not reflect the liabilities arising from Venmo's unlawful business practices. Moreover, there was no indication

that Venmo was engaged in unfair and deceptive business practices in PayPal's shareholder reports and/or SEC filings.

5.      Defendants' unlawful scheme continued unabated until late April 2016.  Then, on April 28, 2016, the Company suddenly disclosed that it had received a Civil Investigation Demand ("CID") from the U.S. Federal Trade Commission ("FTC") investigating whether Venmo had "engaged in deceptive or unfair practices in violation of the Federal Trade Commission Act." PayPal also revealed that the "CID could lead to an enforcement action and/or one or more consent orders, which may result in substantial costs, including legal fees, fines, penalties, and remediation expenses and actions, and could require us to change aspects of the manner in which we operate Venmo."

6.      On this news, the price of PayPal stock declined, falling from $40.01 per share on April 27, 2016 to $37.53 per share on May 20, 2016, wiping out millions in once valuable shareholders' equity.  Worse yet, the Company has already been forced to pay a fine to resolve unfair and deceptive business practice claims brought by the Attorney General for the State of Texas. Additionally, the Company has been named as a primary defendant in a costly and expensive to defend class action lawsuit for alleged violations of the federal securities laws.

7.      Although PayPal has been severely injured, defendants have not fared nearly so badly.  On the contrary, defendants have collectively pocketed more than $60 million in fees, salary, incentive-based compensation payments and other benefits that were not justified in light of PayPal's performance while under their stewardship.  These payments wasted valuable corporate assets and unjustly enriched defendants.

8.      Nevertheless, the PayPal Board of Directors ("Board") has not taken any legal action against the directors and officers responsible for this debacle.  Nor will they, because each of the

defendants is interested in the outcome of any such legal action.  Accordingly, by this action, plaintiff seeks to vindicate PayPal's interests against it wayward fiduciaries.

## INTRADISTRICT ASSIGNMENT

9.      A substantial part of the events or omissions which give rise to the claims in this action occurred in the county of Santa Clara, and as such this action is properly assigned to the San Jose division of this Court.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under §14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78n(a), and under state law for breach of fiduciary duty, corporate waste and unjust enrichment.  In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the U.S. mail and the facilities of the national securities markets.

11.      This Court has subject matter jurisdiction pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, as well as 28 U.S.C. §1331.  This Court also has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

12.      This Court has personal jurisdiction over each defendant because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the district courts permissible under traditional notions of fair play and substantial justice.

13.      Venue is proper in this Court under 28 U.S.C. §1391(b) because: (i) PayPal maintains its principal place of business in this District; (ii) one or more of the defendants either reside(s) in or maintain(s) executive offices in this District; and (iii) a substantial portion of the transactions and

wrongs complained of herein, including the defendants' participation in the wrongful acts detailed herein, occurred in this District.

## THE PARTIES

**Plaintiff**

14.    Plaintiff Iron Workers Local No. 25 Pension Fund owned eBay common stock continuously from at least December 2013 to until on or about July 17, 2015.  On or about July 17, 2015, plaintiff received PayPal shares through the pro rata distribution by eBay of 100% of the outstanding common stock of PayPal to eBay shareholders.  Plaintiff owns and has continuously owned PayPal common stock since at least July 17, 2015.

**Nominal Party**

15.    Nominal party PayPal is a Delaware corporation with principal executive offices located at 2211 North First Street, San Jose, California.  The Company provides technology platforms that allow consumers and merchants to make digital and mobile payments.  On or about July 17, 2015, PayPal became an independent publicly traded company through the pro rata distribution by eBay of 100% of the outstanding common stock of PayPal to eBay's shareholders.  As a company that offers payment processing services, PayPal in general, and Venmo in particular, are subject to the anti-money laundering laws and federal and state laws prohibiting companies from engaging in any unfair or deceptive trade practices, such as the Federal Trade Commission Act.

**Director Defendants**

16.    Defendant John J. Donahoe ("Donahoe") has been a director of Pay Pal since July 2015.  He also served as President and CEO of eBay from March 2008 to July 2015 and as a director of eBay from January 2008 to July 2015.  Donahoe received at least $590,003 in directors' fees and incentive-based compensation from PayPal not justified by the Company's performance while under his stewardship.  During the relevant period, Donahoe sold 1.8 million shares of his personal PayPal stock for $70.2 million in unlawful insider trading proceeds.  Donahoe has been named as a

1   defendant in a class action lawsuit filed on behalf of PayPal shareholders for alleged violations of the

2   federal securities laws.

3          17.     Defendant Gail J. McGovern ("McGovern") has been a director of PayPal since June

4   2015.  She also served as a director of eBay from March 2015 to July 2015.  McGovern has also

5   served on the Audit, Risk and Compliance Committee of the PayPal Board.  McGovern received at

6   least $389,502 in directors' fees and incentive-based compensation from PayPal not justified by the

7   Company's performance while under her stewardship.

8          18.     Defendant David M. Moffett ("Moffett") has been a director of PayPal since June

9   2015.  He also served as a director of eBay from July 2007 to July 2015.  He has also served on the

10  Audit, Risk and Compliance Committee of the PayPal Board.  Moffett received at least $481,502 in

11  directors' fees and incentive-based compensation from PayPal not justified by the Company's

12  performance while under his stewardship.

13         19.     Defendant Frank D. Yeary ("Yeary") has been a director of PayPal since July 2015.

14  He also served as a director of eBay from January 2015 to July 2015.  Yeary has also served on the

15  Audit, Risk and Compliance Committee of the PayPal Board.  Yeary received at least $367,002 in

16  directors' fees and incentive-based compensation from PayPal not justified by the Company's

17  performance while under his stewardship.

18         20.     Defendant Jonathan Christodoro ("Christodoro") has been a director of PayPal since

19  July 2015.  He also served as a director of eBay from March 2015 to July 2015.  Christodoro

20  received at least $364,002 in directors' fees and incentive-based compensation from PayPal not

21  justified by the Company's performance while under his stewardship.

22         21.     Defendant David W. Dorman ("Dorman") has been a director of PayPal since June

23  2015.  He also served as a director of eBay from June 2014 to July 2015.  Dorman received at least

$382,502 in directors' fees and incentive-based compensation from PayPal not justified by the Company's performance while under his stewardship.

22.      Defendant Wences Casares ("Casares") has been a director of PayPal since January 2016.  Casares received at least $315,057 in directors' fees and incentive-based compensation from PayPal not justified by the Company's performance while under his stewardship.

23.      Defendant Pierre M. Omidyar has been a director of PayPal since July 2015.  He also has served as a director of eBay since May 1996.

**Current and Former Officer Defendants**

24.      Defendant Daniel H. Schulman ("Schulman") has been a director of PayPal since July 2015.  He has also served as President and CEO of PayPal since July 2015.  Schulman received at least $33.3 million in salary and incentive-based compensation from PayPal not justified by the Company's performance while under his stewardship.  Schulman has been named as a defendant in a class action lawsuit filed on behalf of PayPal investors for alleged violations of the federal securities laws.

25.      Defendant John D. Rainey ("Rainey") has been Senior Vice President and CFO of PayPal since August 2015.  Rainey received at least $20.6 million in salary and incentive-based compensation from PayPal not justified by the Company's performance while under his stewardship.

26.      Defendant Patrick L.A. Dupuis ("Dupuis") served as Senior Vice President and Interim CFO of PayPal from July 2015 to August 2015.  He also served as CFO of PayPal from November 2010 to July 2015.  Dupuis received at least $3.4 million in salary and incentive-based compensation from PayPal not justified by the Company's performance while under his stewardship.

**THE FIDUCIARY DUTIES OF PAYPAL'S DIRECTORS AND OFFICERS**

27.      By reason of their positions as PayPal's directors and/or officers and because of their ability to direct and controls the Company's business and corporate affairs, defendants owed PayPal

and its shareholders a fiduciary duty to use their utmost ability to control and manage PayPal in an honest and lawful manner.  Towards this end, PayPal's directors and officers owed the Company and its shareholders fiduciary duties to exercise good faith and loyal and reasonable supervision over the Company' s management, policies, practices and internal controls.

28.    As PayPal's directors and officers, defendants' fiduciary duties required them to, among other things: (i) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of legal authority and disseminating truthful and accurate statements to the investing public; (ii) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; (iii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and internal controls; (iv) remain fully informed as to how PayPal conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as are necessary to comply with securities laws; (v) ensure that PayPal was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations, including the federal and state banking, consumer protection and securities laws; and (vi) refrain from breaching their duty of loyalty to the Company by adopting practices, procedures and controls inconsistent with their duty of legal compliance.

29.    The Audit, Risk and Compliance Committee Charter of the PayPal Board further confirms the fiduciary obligations of PayPal's directors, providing, in relevant part, as follows:

> The Audit, Risk and Compliance Committee . . . shall provide assistance and guidance to the Board . . . in fulfilling its oversight responsibilities to the Company's stockholders with respect to (i) the Company's corporate accounting and financial reporting practices, . . . (iv) the quality and integrity of the Company's financial

statements and reports, . . . (vii) overseeing the Company's overall risk framework and risk appetite framework and (viii) the Company's compliance with legal and regulatory requirements. In discharging these obligations, the Committee shall maintain and foster an open avenue of communication between the Committee and the independent auditors, the Company's financial management and internal auditors.

\*      \*      \*

DUTIES AND RESPONSIBILITIES

\*      \*      \*

(b)      Review, upon completion of the audit, the financial statements to be included in the Company's Annual Report on Form 10-K;

\*      \*      \*

(c)      Review with the Company's Chief Business Affairs & Legal Officer and/or Chief Compliance Officer, as applicable, any significant legal, compliance or regulatory matters that could have a material impact on the Company's financial statements or the Company's business, financial statements or compliance policies, including material notices to or inquiries received from governmental agencies;

\*      \*      \*

(i)      Discuss earnings press releases;

(j)      Review and discuss with management the Company's major risk exposures, including financial, operational, privacy, security, business continuity legal and regulatory risks, the steps the Company has taken to monitor, control, and manage and [sic] such exposures, and the Company's risk assessment and risk management policies; and regularly report to the Board the substance of such reviews and discussions . . . .

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

30.      In committing the wrongful acts complained of herein, defendants pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of a common plan or design.  In addition to the wrongful conduct complained of herein giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breach of their fiduciary duties.

31.      Each of the defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such action to substantially assist the commission of the wrongdoing complained of herein, each defendant acted with knowledge of the primary wrongdoing,

1    substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall

2    contribution to and furtherance of the wrongdoing.

3                                        **FACTUAL ALLEGATIONS**

4           32.    PayPal is a provider of technology platforms that allow consumers and merchants to

5    make digital and mobile payment.  In December 2013, PayPal, while a subsidiary of eBay, assumed

6    control of Venmo, a smartphone application the enables users to pay others via text message, when

7    eBay acquired Braintree for $800 million.  Two years later, PayPal became a separate publicly

8    traded company as a part of a spin-off transaction from eBay.

9

10          33.    As PayPal's corporate fiduciaries, defendants owed PayPal fiduciary duties of loyalty

11   and care – the highest duties known to the law.  Nonetheless, while under defendants' stewardship,

12   PayPal's Venmo service engaged in unfair and deceptive business practices, exposing the Company

13   to substantial costs, expenses and risk of loss.  More particularly, defendants failed to disclose in

14   PayPal's shareholders reports, proxy statements and related SEC filings that PayPal was violating

15   federal trade and state unfair and deceptive practices laws, because Venmo was using its users'

16   phone contacts without disclosing how those contacts would be used, did not clearly disclose how

17   Venmo's users' transactions and interactions with other users would be shared, and misrepresented

18   that communications from Venmo were actually from particular Venmo users.

19

20          34.    For example, on May 1, 2014, while PayPal was stilled owned by eBay, eBay

21   announced its financial results for the first quarter of 2014, ended March 30, 2014, in a Form 10-Q

22   filed with the SEC.  For the quarter, eBay reported a net loss of $2.3 billion on revenue of $4.2

23   billion.

24

25          35.    Discussing the laws, rules and regulations applicable to PayPal and Venmo, the

26   May 1, 2014 Form 10-Q further stated, in relevant part, as follows:

27              To date . . . PayPal's subsidiary Venmo, which was acquired as part of the
               Braintree acquisition, provides its peer-to-peer payment service as an agent of an

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                           - 9 -

unaffiliated money transmitter, PreCash. . . .  As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies.  If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo.  Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

*     *     *

Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system.  Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau), the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and Bill Me Later to make additional disclosures to their users and to impose new restrictions on certain of their activities.  For example, in January 2012, the Consumer Financial Protection Bureau finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments.  The Consumer Financial Protection Bureau also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints.  These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business.

36.    On July 18, 2014, eBay announced its financial results for the second quarter of 2014, ended June 30, 2014, in a Form 10-Q filed with the SEC.  For the quarter, eBay reported net income of $676 million on revenue of $4.3 billion.

37.    Discussing the laws, rules and regulations applicable to PayPal and Venmo, the July 18, 2014 Form 10-Q further stated, in relevant part, as follows:

To date . . . PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of an unaffiliated money transmitter, PreCash. . . .  As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies.  If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory

approvals that could impose a substantial cost on PayPal or Venmo.  Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

\*      \*      \*

Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system.  Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau), the general effect of the financial reform law has been, and we expect will continue to be, to require Pay Pal and Bill Me Later to make additional disclosures to their users and to impose new restrictions on certain of their activities.  For example, in January 2012, the Consumer Financial Protection Bureau finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments.  The Consumer Financial Protection Bureau also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints.  These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in otherwise adversely impact our business.

38.    On October 16, 2014, eBay announced its financial results for the third quarter of 2014, ended September 30, 2014, in a Form 10-Q filed with the SEC.  For the quarter, eBay reported net income of $673 million on revenue of $4.3 billion.

39.    Discussing the laws, rules and regulations applicable to PayPal and Venmo, the October 16, 2014 Form 10-Q further stated, in relevant part, as follows:

To date . . . PayPal's subsidiary Venmo, which was acquired as part of the Braintree acquisition, provides its peer-to-peer payment service as an agent of PayPal, Inc. . . .  As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies.  If PayPal or Venmo were found to be in violation of money services laws or regulations, PayPal or Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change its business practices or required to obtain additional licenses or regulatory approvals that could impose a substantial cost on PayPal or Venmo.  Any change to PayPal's business practices that makes the service less attractive to customers or prohibits its use by residents of a particular jurisdiction could also decrease the velocity of trade on eBay and websites operated by Enterprise clients that accept PayPal as a form of payment, which would further harm our business.

\*      \*      \*

Following the global financial crisis, U.S. federal lawmakers enacted the Dodd-Frank Act overhauling the federal government's oversight of consumer financial products and systemic risk in the U.S. financial system.  Although the full effect of the new legislation will be dependent on regulations to be adopted by a number of different agencies (including the Consumer Financial Protection Bureau, or CFPB), the general effect of the financial reform law has been, and we expect will continue to be, to require PayPal and PayPal Credit to make additional disclosures to their users and to impose new restrictions on certain of their activities.  For example, in January 2012, the CFPB finalized new regulations, required by the Dodd-Frank Act that required PayPal, starting in Late October 2013, to provide additional disclosures, error resolution rights and cancellation rights to U.S. consumers who make international remittance payments, which could increase our costs of processing international payments.  The CFPB also launched a complaints portal on its website that allows customers to file complaints against PayPal, Venmo and other money transfer service providers, and publishes information on such complaints.  These and other new obligations will impose new compliance requirements and obligations on us that could increase our costs, may result in increased litigation and the need to make expensive product changes and may otherwise adversely impact our business.

40.     On February 6, 2015, eBay announced its financial results for the fourth quarter and year ended December 31, 2014, in a Form 10-K filed with the SEC.  For the quarter, the Company reported net income of $1 billion on revenue of $4.9 billion.  For fiscal year 2014, the Company reported net income of $46 million on revenue of $17.9 billion.

41.     Discussing the laws, rules and regulations applicable to PayPal and Venmo, the February 6, 2015 Form 10-K further stated, in relevant part, as follows:

PayPal has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico.  PayPal's subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states.  As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies.  Accordingly, PayPal and Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change their business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if they violate these laws or regulations.

42.     On April 23, 2015, eBay announced its financial results for the first quarter of 2015, ended March 31, 2015, in a Form 10-Q filed with the SEC.  For the quarter, eBay reported net income of $626 million on revenue of $4.4 billion.

43.     Discussing the laws, rules and regulations applicable to PayPal and Venmo, the April 23, 2015 Form 10-Q further stated, in relevant part, as follows:

> PayPal has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. PayPal's subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions on their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, PayPal and Venmo could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change their business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial cost if they violate these laws or regulations.

44.     On July 17, 2015, eBay spun off its PayPal unit to plaintiff and eBay's other stockholders. As part of the spin-off, eBay's stockholders received one share of PayPal stock for each share of eBay stock that they owned. PayPal's stock began trading on the NASDAQ on July 20, 2015.

45.     Despite PayPal becoming a separately traded company, defendants continued to make improper statements in the Company's filings. In particular, PayPal continued to report inflated numbers based on Venmo's unfair and deceptive business practices, while at the same time acknowledging that PayPal's business was subject to significant regulatory scrutiny.

46.     Towards this end, on July 29, 2015, defendants caused PayPal to announce its financial results for the second quarter of 2015, ended June 30, 2015, in a Form 10-Q filed with the SEC. For the quarter, PayPal reported net income of $305 million on revenue of $2.2 billion.

47.     Discussing the laws, rules and regulations applicable to PayPal and Venmo, the July 29, 2015 Form 10-Q further stated, in relevant part, as follows:

> PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the United States, in the states where it is required, and the District of Columbia, the U.S. Virgin Islands and Puerto Rico. Our subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states. As licensed money transmitters, PayPal and Venmo are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional

licenses or regulatory approvals that could impose substantial cost if we violate these laws or regulations.

48.     In addition, the Form 10-Q included certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by defendants Schulman and Dupuis, certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.  The certifications stated, in relevant part, as follows:

I, [Daniel H. Schulman/Patrick L.A. Dupuis], certify that:

1.  I have reviewed this report on Form 10-Q of PayPal Holdings, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

a)      Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b)      Designed such internal control over  financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c)      Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)      Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an

annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which  are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

*       *       *

I, [Daniel H. Schulman/Patrick L.A. Dupuis], hereby certify pursuant to 18 U.S.C. Section 1350 adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 that:

(i)  The accompanying quarterly report on Form 10-Q for the quarter ended June 30, 2015 fully complies with the requirements of Section 13(a) or Section 15(d) of the Securities Exchange Act of 1934, as amended; and

(ii)  The information contained in such report fairly presents, in all material respects, the financial condition and results of operations of PayPal Holdings, Inc.

49.    On October 29, 2015, defendants caused PayPal to announce its financial results for the third quarter of 2015, ended September 30, 2015, in a Form 10-Q filed with the SEC.  For the quarter, PayPal reported net income of $301 million on revenue of $2.2 billion.

50.    Discussing the laws, rules and regulations applicable to PayPal and Venmo, the October 29, 2015 Form 10-Q further stated, in relevant part, as follows:

In the United States, PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the states where it is required, as well as in the District of Columbia, the U.S. Virgin Islands and Puerto Rico.  Our subsidiary, Venmo, is also licensed as a money transmitter in certain U.S. states, and acts as an authorized delegate and agent of PayPal in the states where Venmo is not directly licensed.  As licensed money transmitters PayPal and Venmo are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies. Accordingly, if we violate these laws or regulations, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial costs.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                          - 15

51.     In addition, the Form 10-Q included certifications pursuant to SOX signed by defendants Schulman and Rainey, certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

52.     On February 11, 2016, defendants caused PayPal to announce its financial results for the fourth quarter and year ended December 31, 2015, in a Form 10-K filed with the SEC.  The Form 10-K was reviewed and approved by defendants Schulman, Rainey, Casares, Christodoro, Donahoe, Dorman, McGovern, Moffett, Omidyar and Yeary.  For the quarter, the Company reported net income of $367 million on revenue of $2.5 billion.  For fiscal year 2015, the Company reported net income of $1.2 billion on revenue of $9.2 billion.

53.     Discussing the laws, rules and regulations applicable to PayPal and Venmo, the February 11, 2016 Form 10-K further stated, in relevant part, as follows:

> In the United States, PayPal, Inc. has obtained licenses to operate as a money transmitter (or its equivalent) in the states where it is required, as well as in the District of Columbia, the U.S. Virgin Islands and Puerto Rico.  This license includes not only the PayPal branded products and services in these states, but also our Venmo branded products and services.  Our subsidiary, Xoom, is also licensed as a money transmitter in certain U.S. states.  As licensed money transmitters, PayPal and Xoom are subject to restrictions with respect to their investment of customer funds, reporting requirements, bonding requirements and inspection by state regulatory agencies.  Accordingly, if we violate these laws or regulations, we could be subject to liability and/or additional restrictions, forced to cease doing business with residents of certain states, forced to change our business practices or be required to obtain additional licenses or regulatory approvals that could impose substantial costs.

54.     In addition, the Form 10-K included certifications pursuant to SOX signed by defendants Schulman and Rainey, certifying that the financial information contained in the Form 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     Defendants' statements referenced in ¶¶34-54 were materially false and misleading when made because defendants misrepresented and/or failed to disclose adverse, material non-public

facts about PayPal's business and its compliance with the law with regard to Venmo's illegal business practices, which in turn inflated the above specified financial results.

56.     On April 14, 2016, defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares and Omidyar caused PayPal to issue a Proxy Statement on SEC Form DEF 14A (the "Proxy") to PayPal shareholders.  In the Proxy, defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares and Omidyar solicited votes from PayPal shareholders in order to re-elect themselves to the PayPal Board.  In support of their bid for re-election, defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares and Omidyar highlighted their supposed successful oversight of the Company.  They also represented that "the Board is committed to good corporate governance."  Additionally, the Proxy negligently assured voting shareholders that during 2015 and early 2106 the Audit Committee, including defendants Moffet, McGovern and Yeary, had reviewed the Company's compliance management system and reviewed with the Chief Legal Officer matters that may have a material impact on the financial statements or internal control over financial reporting and the effectiveness of the Company's compliance program.  In addition, the Proxy statement stated that the Audit Committee during the same period regularly received status reports of compliance issues.

57.     Defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares and Omidyar's statements in the Proxy were false.  The Board was not committed to strong or even good corporate governance, but rather, PayPal's Venmo service was engaging in unlawful trade practices. Indeed, PayPal had already received a CID about Venmo's deceptive practices before making the misleading statements in the Proxy.  As a result, defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares and Omidyar should have known about the deficiencies in their corporate governance at the time of the Proxy.

58.     The statements about the Board's governance practices were the essential link to PayPal shareholders re-electing defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares and Omidyar to the PayPal Board.  Indeed, the Company's and the Board's mention of the supposedly "strong governance standards" and diligent oversight of the Company's purported compliance management system demonstrates that the defendants themselves thought these statements were material to stockholders in violation of the federal securities laws.

59.     Defendants' unlawful scheme continued unabated until late April 2016.  Then, on April 28, 2016, the Company suddenly disclosed in a Form 10-Q that it had received a CID from the FTC investigating whether Venmo engaged in deceptive or unfair practices in violation of the Federal Trade Commission Act.  The 10-Q stated, in relevant part, as follows:

> On March 28, 2016, we received a Civil Investigative Demand ("CID") from the Federal Trade Commission ("FTC") as part of its investigation to determine whether we, through our Venmo service, have been or are engaged in deceptive or unfair practices in violation of the Federal Trade Commission Act.  The CID requests the production of documents and answers to written questions related to our Venmo service.  We are cooperating with the FTC in connection with the CID.  The CID could lead to an enforcement action and/or one or more consent orders, which may result in substantial costs, including legal fees, fines, penalties, and remediation expenses and actions, and could require us to change aspects of the manner in which we operate Venmo.

60.     Just as PayPal shareholders were digesting this news, on May 20, 2016, the Attorney General for the State of Texas, the Honorable Ken Paxton, announced a settlement with PayPal over Venmo's unlawful business practices.  The settlement announcement stated, in relevant part, as follows:

> The Texas Attorney General's Consumer Protection Division conducted an investigation for potential violations of the Texas Deceptive Trade Practices Act (DTPA) and found a number of issues regarding the safety and security of the Venmo app.  According to investigators, Venmo used consumers' phone contacts without clearly disclosing how the contacts would be used, did not clearly disclose how consumers' transactions and interactions with other users would be shared, and misrepresented that communications from Venmo were actually from particular Venmo users.  As a result, consumers may have publically exposed private information regarding their payments.  In January 2016 alone, Venmo processed $1 billion in transactions.

As part of its settlement, PayPal agrees that its Venmo app will improve disclosures to consumers regarding privacy and security. Paypal also agrees to better inform users of the safeguards available on its app, and ensure consumers understand who will be able to view their transaction information. The settlement also includes a payment of $175,000 to the State of Texas.

61.     In the wake of these adverse revelations, the price of PayPal stock declined, falling from $40.01 per share on April 27, 2016 to $37.53 per share on May 20, 2016, wiping out millions in once valuable shareholders' equity.

## DAMAGES TO PAYPAL

62.     As a direct and proximate result of defendants' misconduct, PayPal has been severely damaged and injured. Moreover, defendants' faithless acts and/or omissions have irreparably damaged PayPal's credibility, corporate image and goodwill. For at least the foreseeable future, PayPal will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that PayPal's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as a direct and proximate result of defendants' misconduct, PayPal has been named as a defendant in class action lawsuits for violations of the federal securities laws.

## DERIVATIVE ALLEGATIONS

63.     Plaintiff incorporates ¶¶1-62

64.     Defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares, Omidyar and Schulman breached their fiduciary duty of loyalty (and candor and good faith) and engaged in unlawful conduct. Accordingly, a pre-suit demand on the PayPal Board to commence, let alone vigorously prosecute, this action is a useless and futile act, and is therefore excused.

65.     First, the members of PayPal's Board have demonstrated their unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the corporation for the violations of law complained of herein. These are people they have developed professional relationships with, who are their friends

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                                    - 19 -

1    and with whom they have entangling financial alliances, interests and dependencies, and therefore,

2    they are not able to and will not vigorously prosecute any such action.

3         66.    Second, the PayPal Board participated in, approved and/or permitted the wrongs

4    alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from

5    PayPal's shareholders or recklessly and/or negligently disregarded the wrongs complained of herein,

6    and is therefore not disinterested.  As a result of their access to and review of internal corporate

7    documents, or conversations and connections with other corporate officers, employees, and directors

8    and attendance at management and/or board meetings, each of the defendants knew the adverse non-

9    public information regarding PayPal's business and financial results, including that its Venmo

10   service was engaged in unfair and deceptive business practices.  Pursuant to their specific duties as

11   Board members, the members of the PayPal Board are charged with the management of the

12   Company and to conduct its business affairs.  Defendants Donahoe, McGovern, Moffett, Yeary,

13   Christodoro, Dorman, Casares, Omidyar and Schulman breached their fiduciary duty of loyalty (and

14   candor and good faith) owed to PayPal and its shareholders in that they caused false and misleading

15   statements and/or omissions about PayPal's business and financial results to be made to PayPal

16   shareholders. Thus, the PayPal Board cannot exercise independent objective judgment in deciding

17   whether to bring this action or whether to vigorously prosecute this action because each of its

18   members participated personally in the wrongdoing or are dependent upon other defendants who did.

19        67.    Third, the acts complained of constitute violations of the fiduciary duty of loyalty

20   (and candor and good faith) owed by PayPal's directors and these acts are incapable of ratification.

21        68.    Fourth, the members of PayPal's Board have benefited, and will continue to benefit,

22   from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of

23   control and the perquisites derived thereof, and are incapable of exercising independent objective

24   judgment in deciding whether to bring this action.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

69.     Fifth, any suit by the directors of PayPal to remedy these wrongs would likely further expose the liability of defendants under the federal securities laws, which could result in additional civil and/or criminal actions being filed against one or more of the defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

70.     Sixth, PayPal has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the PayPal Board has not filed any lawsuits against defendants or others who were responsible for that wrongful conduct to attempt to recover for PayPal any part of the damages PayPal has suffered and will suffer thereby.

71.     Seventh, defendants McGovern, Moffett and Yeary, served as members of the Audit, Risk and Compliance Committee.  As such, these defendants were responsible for reviewing the adequacy of PayPal's internal controls, reviewing the integrity of PayPal's annual and quarterly financial results and financial statements, and reviewing PayPal's annual and quarterly earnings press releases.  Nonetheless, defendants McGovern, Moffett and Yeary breached their fiduciary duties, along with the PayPal Board, by causing PayPal to make false and misleading statements and/or omissions to shareholders in the Company's earnings releases and SEC filings, as well as by failing to ensure that adequate internal controls were in place at the Company's operations.  As a result, defendants McGovern, Moffet and Yeary are not disinterested and face a substantial likelihood of liability that renders a pre-suit demand upon them futile.

72.     Eighth, defendant Schulman is employed full time by the Company, and has received and will continue to receive substantial monetary compensation as a result of that employment. Defendant Schulman will act to preserve and not threaten his position of control and the perquisites thereof, and is therefore incapable of exercising independent objective judgment in deciding whether to bring this action.

73.     Ninth, demand is excused because the conduct alleged herein, including the issuance of false and misleading statements and/or omissions to PayPal shareholders, was not the product of a valid exercise of business judgment.  Defendants' misconduct alleged herein, including the issuance of false and misleading statements and/or omissions to PayPal shareholders, was so egregious on its face that Board approval cannot meet the test of business judgment, and a substantial likelihood of director liability for breach of fiduciary duty therefore exists.

74.     Tenth, while in possession of adverse material non-public information regarding PayPal's business, financial results and operations, defendant Donahoe sold over 1.8 million shares of his personal PayPal stock for more than $70.2 million in unlawful insider trading proceeds. Defendant Donahoe profited from the misconduct particularized herein.  Consequently, he is not disinterested in the outcome of this litigation and a pre-suit demand is excused.

75.     Plaintiff has not made any demand on shareholders of PayPal to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     PayPal is a publicly traded company with more than 1.2 billion shares outstanding, and hundreds or thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## FIRST CAUSE OF ACTION

### Against All Defendants for Breach of Fiduciary Duty

76.     Plaintiff incorporates ¶¶1-75.

77.     By their wrongful acts and omissions, defendants breached their fiduciary duties by causing or permitting PayPal's Venmo service to engage in unfair and deceptive business practices.

Defendants also breached their fiduciary duty of loyalty by, among other things, making materially false statements and/or omissions regarding PayPal's business and financial results in the Company's shareholder reports and filings with the SEC.

78.     As a result of defendants' faithless misconduct, PayPal has been damaged.

79.     Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## SECOND CAUSE OF ACTION

### Against All Defendants for Corporate Waste

80.     Plaintiff incorporates ¶¶1-75.

81.     By their wrongful acts and omissions, defendants wasted PayPal's valuable corporate assets by, among other things, causing the Company to pay improper fees, salaries, incentive-based compensation and other benefits to defendants who breached their fiduciary duties owed to PayPal and its shareholders.   PayPal received no benefit from these improper payments.   As a result, defendants damaged PayPal and are liable to the Company for corporate waste.

82.     Plaintiff, on behalf of PayPal, has no adequate remedy at law.

## THIRD CAUSE OF ACTION

### Against All Defendants for Unjust Enrichment

83.     Plaintiff incorporates ¶¶1-75.

84.     By their wrongful acts and omissions, defendants were unjustly enriched at the expense and to the detriment of PayPal.

85.     All the payments and benefits provided to defendants were at the expense of PayPal. The Company received no benefit from these payments.

86.     Plaintiff, on behalf of PayPal, seeks restitution from defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

**FOURTH CAUSE OF ACTION**

**Against All Defendants (Except Rainey and Dupuis)
for Violations of §14(a) of the Exchange Act and
SEC Rule 14a-9 Promulgated Thereunder**

87.     Plaintiff incorporates ¶¶1-75.

88.     Defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares, Omidyar and Schulman caused or permitted PayPal to disseminate the false and misleading Proxy to PayPal shareholders.  In so doing, defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares, Omidyar and Schulman made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made not misleading in violation of §14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

89.     The false and misleading statements and omissions in the Proxy were material in that a reasonable shareholder would consider them important in deciding how to vote on whether to re-elect defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares, Omidyar and Schulman to the Board.  Further, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to shareholders.

90.     As a result, defendants Donahoe, McGovern, Moffett, Yeary, Christodoro, Dorman, Casares, Omidyar and Schulman violated §14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff demands judgment as follows:

A.     Awarding money damages against all defendants, jointly and severally, for all damages and losses suffered, and to be suffered, as a result of the acts and transactions complained

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- 24

of herein, together with pre-judgment interest, to ensure that defendants do not participate therein or benefit thereby;

> B.     Directing all defendants to account for all damages caused by them and all profits, special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all fees, salaries, incentive-based compensation, benefits and insider sales proceeds, and imposing a constructive trust thereon;

> C.     Directing PayPal to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, the federal healthcare laws, rules and regulations, the federal securities laws and state corporation laws regarding fiduciary duties;

> D.     Awarding punitive damages;

> E.     Awarding costs and disbursements of this action, including reasonable attorneys', accountants' and experts' fees; and

> F.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  October 5, 2017                    ROBBINS GELLER RUDMAN
                                             & DOWD LLP
                                           SHAWN A. WILLIAMS


                                                _s/ Shawn A. Williams_
                                           SHAWN A. WILLIAMS

                                           Post Montgomery Center
                                           One Montgomery Street, Suite 1800
                                           San Francisco, CA  94104
                                           Telephone:  415/288-4545
                                           415/288-4534 (fax)

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT                                   - 25 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROBBINS GELLER RUDMAN
   & DOWD LLP
TRAVIS E. DOWNS III
BENNY C. GOODMAN III
ERIK W. LUEDEKE
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Dennis Kramer, on behalf of the Iron Workers Local No. 25 Pension Fund hereby verify that I am familiar with the allegations in the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment and Violation of the Federal Securities Laws ("Complaint"), and that the fund authorized the filing of the Complaint and that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 4th day of OCTOBER , 2017.

IRON WORKERS LOCAL NO. 25
PENSION FUND

By: _____
DENNIS KRAMER
Administrator